Our next case on the call of the docket is Agenda No. 15, Case No. 113873, Skokie Castings, Inc., Appalachia v. Illinois Insurance Guaranty Fund Appellant. Counsel for the appellant, please proceed. May it please the Court. Good morning, Your Honors. My name is Stephen Whitmer, and I'm Counsel for the Appellant. Illinois Insurance Guaranty Fund. This case centers on the meaning of three words, workers' compensation claims. These three words are found in the Illinois Insurance Guaranty Fund Act, and they are the words that the legislature used to identify one specific category of claims to be paid by the fund without limit upon the insolvency of an insurance claim. So, if the claim at issue here falls within the definition of workers' compensation claims, then the fund is required to pay that claim in full without limit. But if the claim at issue falls outside the definition of workers' compensation claims, then the fund is only liable up to the $300,000 cap. Now, the difference between what is and is not a workers' compensation claim is that the workers' compensation claim is best demonstrated by comparing two separate and distinct claims. First, let's address the claim that is not before the Court here today. That is the claim that was brought by Ms. Saloki. In 1985, Ms. Saloki was injured while on the job at Wells Manufacturing. To recover for her injuries, she pursued a claim before the Illinois Workers' Compensation Commission. At that point, it was referred to as the Industrial Commission. And the commission determined that Ms. Saloki's claim was compensable, and then Wells Manufacturing at that point began to pay Ms. Saloki. That claim, Ms. Saloki's claim, is undisputably a workers' compensation claim. There is no contention on that point. But Ms. Saloki's claim is materially different than the one that is currently before the Court here today. The one that is before the Court today is Wells' claim for reimbursement or indemnification for the amounts that it has paid to Ms. Saloki for her claim. Therefore, the claim we're talking about here today is the one that was brought by Wells under the excess insurance policies at issue. Because the legislature did not define the term workers' compensation claims, we need to look to their plain and ordinary meaning. And there are four reasons why the plain and ordinary meaning of workers' compensation claims does not apply to Wells' claim. First, and this first point is key, Wells does not have a workers' compensation claim because Wells' claim is not for workers' compensation benefits. It is not for workers' compensation benefits. Ms. Saloki's claim most definitely is for workers' compensation benefits. Wells' claim is not. As mentioned, it is merely a claim for indemnification or reimbursement for the amounts that it had paid to Ms. Saloki. Second, Wells does not have a workers' compensation claim because its claim does not spring from the Workers' Compensation Act. Ms. Saloki's claim, it does. It comes directly from the workers' compensation act. But Wells' claim, in contrast, generates from a contract, specifically the excess policies we're talking about here. Mr. Whitaker, we're not constrained, obviously, by the New Mexico Supreme Court, but is your position that they just got it wrong or is that case somewhat distinguishable from the case before us? Because it appears that the lower courts did rely upon that decision. Your Honor, you're correct. Both the lower courts relied heavily on the New Mexico case, and that case is factually dissimilar to this case in a material way. An issue in the New Mexico case was whether there was a covered claim at all. The fight was, was the claim reinsurance or was it direct insurance? And the court had to determine which of the two because reinsurance is not covered under guarantee fund statutes generally. That's not an issue here today. The Illinois insurance guarantee fund has determined already that this claim is compensable. The question is whether it's a workers' compensation claim or not. That issue was not before the court in the New Mexico case. So respectfully, that case provides no guidance for this court here today. Mr. Whitmer, before the fund reached that $300,000 cap, there were payments from the fund, correct? Correct. So did they go to the entity, the employer, or did they go directly to the injured party? The record was never developed on that point, Your Honor, but the money ultimately made its way to Ms. Saloki. We know that because her claim has been paid in full, and there's no question about that. And that's something that is important. Because we think that both courts below were concerned. So the answer is based on the record, you're not able to answer? Based on the record, I'm not able to answer that, but it is our understanding that the money did get paid to Ms. Saloki ultimately one way or the other. Thank you. We do think there was a concern at both courts below as to whether Ms. Saloki ultimately would get paid based on different factual scenarios that might tell you that. First, Wells Manufacturing is required to pay the money to Ms. Saloki. But that's the question, is where the excess workers' compensation insurer becomes insolvent, is it fair or right to impose the remaining payments on the self-insured employer? In the event that the insurer becomes insolvent, it is fair. It is Wells Manufacturing that signed up as a self-insurer to be initially responsible for this payment. And to be sure, it purchased excess insurance from home. But it did so knowing that would home go into insolvency, the guarantee fund would step in and it would only be having the protection that the guarantee fund would provide. But where does this provide for caps? That's what I'd like to know in this scenario for workman's comp. The Illinois Insurance Guarantee Fund Act provides that there is a $300,000 cap on all claims. General liability claims, for example, or auto liability claims. Workers' compensation claims are not capped. Those would go up to the moon. But the point that we wanted to make sure was clear is that to the extent Wells Manufacturing were to file for bankruptcy or otherwise not be able to pay Ms. Saloki her claim, then the legislature has created another entity, the self-insurer's advisory board, which would step in and pay Ms. Saloki for her full claim to the end of time. That entity was created by the legislature in situations like that. For workman's comp? Yes. If you're a self-insurer, you have to pay into this fund, the self-insurer's advisory board, so that upon the insolvency of the self-insurer, there has to be a fund there to pay that money. And the legislature decided that fund would be the self-insurer's advisory board. So that's in the case when the self-insurer doesn't have excess workers' compensation insurance? That's not, the statute doesn't, it says when the excess insurance is unavailable or unable to respond, then the self-insurer's advisory board would respond. And here, HOME is not available to respond, that's for sure, because it's an insolvency, the original insurer. Is there anything, any import to the fact that in August 2005, right, the fund ceased paying Saloki's benefits, right, the $300,000 had been reached? That's correct. And then Wells, HOME no longer in the picture, that's why you came into being in the first place, then Wells resumed paying Saloki's comp claim here? You stopped paying, Wells starts paying, and where does the money go once the flow stops from the guarantee fund? It goes, Wells has to now pay the employee. There is a comp claim here, to be sure. Ms. Saloki's claim is there, still is there today, and when Wells starts paying it, it is paying a workers' compensation claim. There's no dispute over that. The question is, when it then turns to the Illinois Insurance Guarantee Fund and says, I want to be reimbursed now under what's referred to as an excess policy, is it now a claim being brought by Wells against the fund, is that a workers' comp claim? And the courts that have addressed that issue have said no. Under what circumstances would the fund be liable for a workers' compensation claim? If there is a primary insurance, then the fund would be responsible for that claim up to the moon. Excess insurance, it would not. And this is an important question that you ask, Your Honor, because this is, I think, the question that confused the courts below. The courts below said, what is the difference between primary and excess insurance? I don't see a difference. And as we explained in our briefs, there is a fundamental difference between primary and excess insurance, and that is a primary insurance policy pays workers' compensation benefits. In Illinois, the law is clear. If you are a primary insurer, you sign up to pay directly to the employee the benefits. Not so with excess insurers, and this is the key. Excess insurance policies do not and never have paid workers' compensation benefits. They reimburse employers for payments they have made. But if Ms. Saloki had come to home and said, I want some money, or if she had come to the Illinois Insurance Guaranteed Fund and said, I want some money, the Guaranteed Fund at home would have no liability under the law. No question. There is no dispute over that. And that, we would respectfully submit, is a material difference between primary and excess insurance that the courts below misunderstood. Would this employer, Saloki or Wells, if it had no excess insurance, would it be eligible for this reimbursement from the Guaranteed Fund? If it had no primary insurance and no excess insurance? It would not. The Guaranteed Fund is only triggered when there is an insurer, an underlying insurer that becomes insolvent. Their only recourse then is to the self-insured advisory board. That would be correct. Now, the only court, the courts that have addressed this issue head-on have explained precisely what we're saying here today. And the National Union case, which we address in our papers, it is an unpublished decision, but it is directly on point. The question there is precisely the one before this court today. Is an excess policy claim a workers' compensation claim? And the court said, no, it is not. And here's why. The court explained its reasoning. An excess policy does not pay workers' compensation benefits. An excess policy does not pay workers' compensation claims. An excess policy is not a workers' compensation policy. Those were the findings that the National Union Court made, and based on that concluded excess policy claims are simply not workers' compensation claims. The other court that addressed this issue is the Oneida Court. And relying on a circular issued by the Insurance Department for the State of New York, the Oneida Court made clear that excess policies are not workers' compensation insurance. Because such policies do not pay statutory workers' compensation benefits to employees. Now, the holding we are asking for today is consistent with the public policy of Illinois, as articulated by this court. In the Hosman case, this court underscored that the fund was to be a source of last resort. The appellate court further highlighted that point in the Roth and the Herald decisions that we cite in our brief. And Illinois courts have made clear that the legislature never intended for the fund to pay all policyholder claims. Instead, the legislature intended the fund to be a source of limited payment and a source of last resort. Why? Well, as the Illinois courts have explained, the costs of my client, the fund, are paid for by assessments of member insurers. And those costs are then passed on to the policyholders. Because the costs of the fund are ultimately borne by the insurance-consuming public, the people of the State of Illinois ultimately pay for it, the fund's payment limitations are there to make sure that the cost of insurance in the State of Illinois is maintained at an accessible level. Here, there is another source available, and it is Wells. It is the entity that signed up in the first instance to pay workers' compensation benefits should they arise. So there's a choice here. We can either give the words workers' compensation claims their natural meaning, and that would comport with this court's directive that the fund be a limited source of limited protection. That's one option. Or take the appellate court's approach, which expanded the definition of workers' compensation claims well beyond its natural moorings. And we submit also violates this court's public policy that the fund should be a source of last resort. Finally, we'd like to address a couple issues that appear to trouble the appellate courts below. The appellate court seemed to be concerned that if the legislature intended to exclude excess claims, then why didn't it identify it as one of the claims right in the act, say workers' compensation claims does not meet excess claims. Well, respectfully, that argument just doesn't work. Because the legislature did not list every type of claim that is subject to the cap. It merely identified the one type of claim that is not, and we talked about that earlier. It is not reasonable to expect that the legislature would identify every type of claim, provide a laundry list of every claim that gets capped. For example, the legislature could have said workers' compensation claims are uncapped and we are not going to cap general liability claims. We are not going to cap auto liability claims. We are not going to cap excess liability claims. The legislature chose a different direction, which is merely to say we'll tell you the one type of claim that is capped, and that is uncapped, that is workers' compensation claims. So respectfully, the appellate court's question about statutory construction, which it focused on in its opinion, doesn't make much sense. In conclusion, Well's claim does not meet the common definition of a workers' compensation claim. It is not a claim for statutory benefits. It is not a claim that is brought at the Workers' Compensation Commission. It is not a claim that arises from the Workers' Compensation Act. It is something distinctly different. It is a claim for indemnification under an indemnification contract, and that's all. Second, the courts that have addressed this issue, the National Union Court and the United Court, have specifically found that excess policies do not provide workers' compensation insurance. Third, the fund's position squares with a well-established public policy that has been set by this court and the appellate courts below that the fund needs to be a source of last resort. And for all these reasons, we respectfully request that this court reverse the appellate court decision below and find that the claim at issue here today does not fall within the definition of workers' compensation claims. Mr. Whitmer, you may have already addressed this, and forgive me if I'm asking you to go over to the same territory. I want to make sure I understand your argument. Under the definition section of the statute that has a description of what a, quote, covered claim is, that's in 534.3a, if I'm looking at the right section. Does that sound right? It does. Tell me what your argument is about why this claim that you say is an indemnification claim and not a workers' comp claim. I understand that. But tell me how it's not a, quote, covered claim under this statute. That's your position. It is not. My position is the exact opposite. This claim that's before the court today is most certainly a covered claim, which is why my claim has paid out $300,000 toward it. So it's covered, but only up to the $300,000? Excess policy claims are covered claims in the state of Illinois. No dispute about it. The question is, is an excess policy claim also fall within the ambitive workers' compensation claims so that the guarantee fund's obligation goes up to the moon? Okay, I'm with you. So let me ask you this. In the section under the 537.2 obligation to fund where the $300,000 cap is, when it uses that exception clause, accept that this limitation shall not apply to any workers' compensation claims, tell us what scenario that is. Okay. So in a situation, let's assume that Wells Manufacturing had decided not to self-insure and had instead gone to a primary insurer, pick Liberty Mutual. And they went to Liberty Mutual and said, I want primary insurance. And then Liberty Mutual goes insolvent. And then they turn to the fund and say, okay, now it's your turn to pay. And the guarantee fund steps in and says, okay, I will now pay that claim up to the moon. Liberty Mutual was required before it went insolvent under that hypothetical to pay it to the moon. Now the guarantee fund is required to pay it to the moon because it's a workers' compensation claim. It's a claim for benefits. And juxtapose that against the claim we're talking about here today, which is merely an indemnification claim under a contract. The guarantee fund has long paid excess policy claims up to the $300,000 cap. It's a covered claim. New Mexico, they had a fight of it out there. And they said, is it a covered claim or is it not? That's what Justice Thomas was speaking to. Not the issue here. It's a covered claim. The question is, is it also a workers' compensation claim? Thank you. Thank you, Your Honors. Counsel for the Eppley. Good morning, Your Honors. May it please the Court, Mr. Whitmer. I'm Jack Shanahan on behalf of the Eppley, Skokie Castings as successor to Wells Manufacturing Company. The issue in this case comes down to basic rules of statutory interpretation as they relate to Section 537.2 of the Guarantee Fund Act. These were terms you were discussing during Mr. Whitmer's presentation. Section 537.2 sets the limit on what the guarantee fund is obligated to pay when they step in the shoes of an insolvent insurer on a given policy claim. This section states that the fund's liability is limited to $300,000, except that this limitation, this cap, shall not apply to any workers' compensation claim. That's what's at issue here. How is that to be interpreted? According to Illinois law, it's to be interpreted by the plain and ordinary meaning of those terms. It should be interpreted within the context of the entire Guarantee Fund Act as well. The Guarantee Fund's position seeks to introduce all other elements of interpretation other than what those plain and ordinary terms suggest by their direct meaning. That's not proper statutory interpretation in Illinois. The argument as to applicability of the Workers' Compensation Act provisions take this down a road that this Court need not go because Section 537.2 is clear and unambiguous in its terms. The distinctions as to the type of policy involved here, it's an excess policy, it calls for indemnification rather than direct payment, might be persuasive arguments to make the legislature to change Section 537.2. But one must assume either they were raised when the statute was originally written or it's something now that the Guarantee Fund sees it needs to clarify. But the statute as written is very clear. Every type of insurance policy written by a company that goes into insolvency for which the Guarantee Fund then steps in for covered claims has a cap of $300,000 except that this does not apply to workers' compensation claims. Wells Manufacturing purchased an excess workers' compensation policy from Home Insurance. Its employee, Mona Saloki, was injured. Wells paid its deductible, its SIR, whatever you want to call it, to $200,000, at which point the home workers' compensation excess policy activated. Home then paid the workers' compensation benefits pursuant to the Workers' Compensation Commission Award. They would still be paying those benefits. The mechanism of how they are done, reimbursement to Wells or directly to Saloki, I don't think is relevant because the statute, the legislature didn't make that relevant. Home became insolvent, so the Guarantee Fund, in the words of the Guarantee Fund Act, is now deemed to be that insurer. A Guarantee Fund, in this case, is home insurance for all intents and purposes. And they are continuing to pay pursuant to the Workers' Compensation policy on the Workers' Compensation claim of Mona Saloki. Counsel, let me ask you a question. Could you respond to the argument that was made here that the proper remedy is a claim on the Self-Insured Advisory Board rather than on the fund? That would be relevant if Wells was insolvent. The Self-Insured Advisory Board has nothing to do with this case because it is only activated when a self-insured employer becomes insolvent. We don't have that here. So, again, it's hypothetical. It's a scenario that one might have to consider or maybe the legislature should consider if they see any sort of gap or conundrum between those two eventualities. But as things stand, the Self-Insured Advisory Board would have nothing to do with this because there's not an insolvent self-insured employer. Mr. Shanahan, if we agreed with opposing counsel's argument, wouldn't then self-insured, would this encourage them not to have excess insurance? Well... For fear of what would happen to them, that they'd end up paying anyway? Well, in the absence of excess insurance for a self-insured, in this case, Wells would have had no recourse to any insurance policy and would have been paying out this award, and more likely they would not have been approved as a self-insured employer before the commission because a self-insured employer must present sufficient evidence of assets, collateral, bonds, security, or excess insurance policies in order to qualify. So if they chose not to obtain excess insurance, they may have had other assets or means of doing that where the commission would have approved them as a self-insured employer. Then if those fail, then they're in a lurch because they don't have insurance policy. So I don't believe that that would discourage employers at all. Excessive insurance is probably the best, under normal circumstances, the best method of insuring the loss, the potential excess loss. But if there was a cap, as suggested by counsel, then they end up paying anyway. Correct. I mean, that's what happened in this case until we brought this action. And, again, the purpose, Wells' original purpose in getting this insurance in addition to qualifying as a self-insured employer was to protect itself. They paid premiums for the protection that this home insurance policy would have provided and did provide to the point that home became insolvent. Now, at that point, the guarantee fund, without objection, and everyone agrees this is a covered claim, comes in and pays. So at that point, when they get to $300,000, what are they paying on? And as I think the clerk questioning Mr. Whitmer understands the issue, they're paying on a workers' compensation claim. And the statute specifically exempts the $300,000 cap from any workers' compensation claim. As I understand this, counsel, we have a deck action, right? Correct. For the court to determine whether or not the guarantee fund should have capped it at $300,000. And I think both of you would agree, as you've been arguing, that the issue becomes whether it's a comp claim or not. In thinking about the deck action, I mean, we have personal injury actions all over the state in which an insurance company that insures the defendant might feel, rightly so, that they have a greater duty to defend than they do to pay. So they go on with the trial, but there's a deck action proceeding indicating whether or not, if there is an award for the plaintiff, whether they'll be reimbursed or not. Is that somewhat of an analogous situation here? You wouldn't say that that deck action is a personal injury action. It's a contract action to determine whether or not payment is due. Isn't that what we have here? I mean, as I think about this, you know, it isn't wells. Let me just see if I get this right, get the names right here. It's the fund is paying wells for their benefit, right, not to Saloki for his benefit. So I know it's a long-fashioned question in trying to get to the ultimate issue here of whether or not this is really workers' compensation that would extend it out past the $300,000. Well, in answer to the first part of the question you were addressing, the deck action in the context of a personal injury action as to which insurer covers or whatever, that is a coverage, typically is a coverage issue. One insurance company says we didn't insure them for this, you have to go to this company and they fight over policy terms or what have you as to who's covering that insurer. This case does not present a coverage issue because home insurance clearly covered wells for this loss and when homes became insolvent, the guarantee fund covered homes at least as a covered claim up to their limit or beyond. So this declaratory action is to have the court tell us what the statute means as opposed to any insurance coverage-type issues. And who benefits out of that deck action? Saloki's getting paid anyway right now, right? Correct. Wells resumed payment of Saloki once the $300,000 was capped. Correct. Now you're saying, and I imagine that you're going to seek, if you prevail, when you file that action, you're not only going to seek payments from that point forward, you're going to want reimbursement for all the payments that Wells made after the $300,000 stopped, right? Correct. And that's actually the order that was entered in by the Supreme, I'm sorry, by the circuit court that was part of our summary judgment action declaring that the fund continued its obligation and therefore they would owe reimbursement to Wells. Right. So no question what brought us, what brought everybody to the table was a comp action filed by Saloki. But the actual deck action and who's going to pay, is that necessarily a comp action? Well, I don't think the fund should benefit from changing the character of the action from a workers' compensation claim to the question you're addressing by cutting off benefits when in fact they owed them. And the question becomes, did they owe them as one interprets the statute? So in point of fact, again, had HOME not become insolvent, HOME would have continued to pay workers' compensation benefits. They did. Had the guarantee fund not interpreted Section 537.2 as it did, they would have continued paying benefits ultimately to Ms. Saloki under her workers' compensation award. Having terminated those benefits, they necessitated Wells to make them but then come to the court and say this was improperly done and we're entitled to what we've paid. So that's, as I think clearly as I can answer the question, the fund has created the situation where they can now argue, well, this is a work comp claim. But the fact is, had they followed their statute and the common sense terms that the $300,000 cap does not apply to work comp claims, we wouldn't be here. In this case, Saloki elected not to have, I guess I'll call it primary workers' comp insurance coverage, opting instead for excess coverage. Would there be the option to an employer to obtain a primary insurance contract with a high deductible? I believe so. For workers' compensation, I think by statute the insurance coverage you get cannot be capped, so that would still be an unlimited direct insurance policy. And I'm not sure that there's any distinction between a high deductible direct insurance policy and a $200,000 retention on an excess policy. That's basically my question. If that can be done, then that will be a question I would ask Mr. Whitmer to address then, too. Right. And I think that exactly gets to the point of this, is that they're raising a mechanics issue of type of payments or the designation of the policy. And if that mattered to the legislature, they would have put that into the Guarantee Fund Act provisions and in Section 537.2. And, in fact, we know this can be done because the New Jersey case, the New Jersey statute, which the court can rely on, specifically exempts excess insurance policies from the provisions that were at issue in that national union case. Does the fact that there's self-insurance here have any impact on the analysis? Does it make any difference whether Wells self-insured or had primary insurance? Only in that it allows the Guarantee Fund at this point to make the argument that because they did not have direct insurance, say with a high premium, but instead chose excess insurance, that the Guarantee Fund can now draw this distinction that, well, this doesn't apply. And, you know, practically speaking or realistically, no, I don't think it makes a difference for this case. And the fund has admitted, as they did today and throughout, had there been a direct insurance policy, they would be liable to the moon, to use their terms. And they're drawing a distinction that doesn't exist in this statute, that because it's a high deductible or a SIR of $200,000 and then this excess policy kicks in, that, you know, now the cap applies because it's not workers' compensation benefits. And that's the only distinction, I think, practically speaking, that exists between Wells getting a direct policy or getting an excess policy and having a high retention. The analysis that counsel raised in the briefing was arguing as to the way to look at this case, I think is taking the tail of the dog first. This is a workers' compensation claim to start, and that's what initiated all this. Home insurance paid workers' compensation benefits pursuant to its policy and the work comp award. To look at it now and say that home only reimbursed or was an excess policy or the fund is only reimbursing, again, is a backward analysis of it. The point is this is a workers' compensation claim, a workers' compensation insurance carrier went out of business, the fund steps in the shoes of that carrier, and the liability should be limitless because that's what their own statute says. Once more, Section 537.2 caps the fund's liability at $300,000, except that this shall not apply to any workers' compensation claims. Those terms could not be clearer. The arguments that the fund raises would be appropriate to the legislature to put in some of the distinctions that they're seeking to draw here to maybe clarify it from their end, but as the statute's written, I think the appellate court properly interpreted it. We would ask that this court uphold that interpretation, affirm the appellate court and the underlying circuit court's grant of summary judgment in our favor on all issues. If there are no further questions, thank you. Thank you, Mr. Shanahan. Mr. Whitmer? Thank you. Mr. Whitmer, before you get going, you made a public policy argument, but I didn't hear it from Mr. Shanahan, but isn't there another public policy argument to be made on his side of the case that workers' compensation benefits, looking at this statute, should be paid without limitation? I know you're saying this is an account claim, but on the public policy side, wouldn't his interpretation of the statute ensure, I know Wells is paying, but that might not always be the case, that the employee will get full benefits? Unquestionably, Your Honor, there is a policy in this state that workers' compensation claims should be paid up to the moon. We acknowledged that before the trial court, and we acknowledge it to the appellate court. So the question isn't whether there should be coverage up to the moon. The question is who should pay for it. And in Illinois, the Illinois legislature has already thought that through. And they said to the extent somebody decides to self-insure, they are the first one on the hook. If they want to turn to excess insurance, they can turn to excess insurance. But if the self-insurer and the excess insurer are unable to pay, you have to look to the SIAB, self-insurer's advisory board, and they will pay Ms. Suloki until her last bill is sent out. So you're right, Your Honor. Workers' comp is important in Illinois that the worker gets paid in full. And there is no concern here. If you rule in favor of the fund, there should be zero concern for this court that Ms. Suloki will receive all of her benefits until the last day. For the reasons I just said. Mr. Shanahan said something that I think is very important. And I want to just clarify it. It's a very important distinction. Section 537.2 does not say that the fund steps into the shoes of home. It says the guarantee fund steps into the shoes of home to the extent of the covered claims. That's in the very first sentence of 537.2. To the extent of the covered claims. Why does that matter? For the reasons we've talked about. The public policy. Covered claims are $300,000 for auto claims, GL claims, excess claims. You have to look to workers' compensation claims to go beyond that. This all goes back to the public policy we were talking about. The legislature doesn't want the guarantee fund to step into the shoes of home and pay everything because the policyholders and ultimately the people of Illinois have to pay for that. And the legislature said we don't want that to happen here. That's an important distinction. Now there was a question. Your Honor asked a question. I want to come back to it. Could Wells Manufacturing have gone and get a primary insurer and received a high deductible? $250,000 deductible, $500,000 deductible. Those happen every day throughout the state. The answer to your question is absolutely yes. Wells could have done that. And, Your Honor, to answer your question, is there a concern here that an insurer like Wells Manufacturing may not choose excess policies and they may choose instead something else like a primary policy? Maybe. If Wells had gone to Liberty Mutual, it would know that whether it's Liberty Mutual or if it for whatever reason became insolvent the guarantee fund would pay up to the moon, Wells would never have to pay a penny. But that would have cost them more. Although it's not discussed in the record, excess policies by definition are not as expensive as primary policies for that reason. Wells had a chance if it wanted to get that protection, just go buy a primary policy. Insurers throughout the state do it every day. But in this case, if Wells hadn't gone insolvent, they would have been paying no matter what even though they paid the lesser amount for the premium. If Wells had gone and received primary insurance, Wells would never have had to pay a penny. No, I'm sorry. I meant the excess policy insurance company. Here, home would have been required to pay. But home would have been required perhaps to pay an auto liability claim up to the moon or whatever they had agreed to. Even though Wells paid less than the amount for the premium. Right. When the guarantee fund comes in, the legislature said, okay, there's a new set of rules. We are capping these claims. We are not going to cap that claim. That's the set of rules. But to address your concern directly, Justice Burke, there's no question that had Wells chose to pay a little bit more and had obtained primary insurance, we wouldn't be here today because the guarantee fund would have paid that all the way up to the moon. They chose instead to do excess, and by doing so, they are obligated to be limited by the covered claim language in the guarantee fund act. That's the bargain that they signed up for. You indicated that they could have gotten a high deductible, which would have equaled the self-insured retention they had. Is that correct? Correct. But that policy would have cost more. But what's the difference, as far as guarantees coverage, if the end result seems to be the same? Well, the end result isn't really the same. The question is, I mean, obviously, excess insurers, primary insurers, they all pay in to the guarantee fund in connection or in relationship to the premium that they're taking in, right? Okay. So both companies pay in to the fund, but the primary pays more. Again, that's not in the record, but yes. And Justice Thomas asked some questions I want to address that really get to, if you look at an excess policy and say anything it covers below, whether it's an excess policy for auto or general liability or workers' compensation, once you purchase that excess coverage, it is the same thing as everything that's below. That's Wells' argument. Once you purchase an excess workers' compensation for workers' compensation, it becomes, it morphs immediately and becomes workers' compensation. If you buy an excess auto policy, it morphs, it immediately becomes an auto policy. There are rules, there are regulations about how workers' compensation insurance is to be treated in this state. The concerns, and we say them in our brief, you can't morph those because they're different. They're different, which is why Wells hasn't been able to identify one case in the history of American jurisprudence which says an excess policy is a workers' compensation policy. The only courts that have addressed it, and the insurance department that addressed it, has said the very opposite. In closing, we ask that this court follow the common definition of workers' compensation claim, which is a claim for workers' compensation benefits, and determine, based on that, that the claim at issue here brought by Wells is not a workers' compensation claim, and therefore the appellate court decision should be reversed. Thank you, Your Honors. Thank you. Case number 113873, Skokie Castings, Appalachia v. Illinois Insurance Guarantee Fund Appellant. It's taken under advisement as agenda number 15. Mr. Whitmer, Mr. Shanahan, we thank you for your arguments. Mr. Marshall, we're going to take a short break. We'll stand in recess until 1030.